UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES SCHWAB & CO., INC.,

               Plaintiff,

       – against –

RETROPHIN, INC., STANDARD REGISTRAR AND
TRANSFER COMPANY, INC, JACKSON SU, and CHUN YI
GEORGE HUANG,

               Defendants.

JACKSON SU and CHUN YI GEORGE HUANG,

               Crossclaim Plaintiffs,

       – against –

RETROPHIN, INC. and STANDARD REGISTRAR AND
TRANSFER COMPANY, INC,

               Crossclaim Defendants.

JACKSON SU and CHUN YI GEORGE HUANG,

               Third-Party Plaintiffs,

       – against –

KATTEN MUCHIN ROSENMAN LLP,

               Third-Party Defendant.

**OPINION AND ORDER**

14 Civ. 4294 (ER)

RAMOS, D.J.:

       Plaintiff Charles Schwab & Co., Inc. ("Schwab") brought this suit to recover the losses

that it suffered when it was forced to cover a series of failed sales of stock issued by Retrophin,

Inc. ("Retrophin"), a biopharmaceutical company. Schwab had executed the failed sales on

behalf of two of its customers, Jackson Su ("Su") and Chun Yi George Huang ("Huang"), who

were former Retrophin employees.  Schwab allegedly did not know that Retrophin, through its agents—Standard Registrar and Transfer Company, Inc. ("Standard") and the law firm Katten Muchin Rosenman LLP ("Katten Muchin")—had placed a Stop-Transfer Order that restricted the sale of Retrophin shares held by Su and Huang, due to disputes arising from their employment at Retrophin.  Schwab alleged that, in forming its false belief that the restricted stock was transferable, it had relied on representations by Retrophin, Standard, Su, and Huang, and commenced suit against those four parties.

On August 7, 2015, Schwab voluntarily dismissed all of its claims pursuant to Federal Rule of Civil Procedure 41(a)(1)(a)(ii).  (Doc. 37).  What remains are crossclaims filed by Su and Huang ("Crossclaim Plaintiffs") against Retrophin and Standard ("Crossclaim Defendants"), and third-party claims filed by Su and Huang against Katten Muchin ("Third-Party Defendant").  Before the Court is a motion by Retrophin, Standard, and Katten Muchin (together, "Defendants") to dismiss those crossclaims and third-party claims pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, which, for the reasons set forth herein, is GRANTED.

## I. BACKGROUND

### A. Factual Background[1]

Su and Huang are former employees of Retrophin, a biopharmaceutical company that, today, is publicly traded on the NASDAQ stock exchange.  Answer, Cross Claims and Third Party Complaint ("Crosscl.") (Doc. 11) ¶¶ 6, 10, 24.[2]  Su and Huang both joined Retrophin in

---

[1] The following facts, accepted as true for purposes of the instant motion, are based on the allegations in the Crossclaims and Third-Party Complaint, documents incorporated by reference, and documents of which the Court may take judicial notice, including documents filed with SEC or in other courts.  *See, e.g.*, *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[2] Su and Huang filed two copies of the same document, entitled "Answer, Cross Claims and Third Party Complaint."  Docs. 10, 11.  Both documents set out the identical factual allegations, crossclaims, and third-party claims.

approximately July 2012, in the midst of the company's efforts to go public via a reverse merger, an undertaking that both Su and Huang "worked diligently to support." *Id.* ¶¶ 10–12.  Retrophin aimed to complete its reverse merger by December 2012, but its capital reserves dwindled as that goal approached, and Retrophin allegedly "began to fail to meet its internal obligations to its employees, including, but not limited to, salary and benefit obligations." *Id.* ¶¶ 13–14.  Su and Huang were among those employees not paid their full salary and benefits.  *Id.* ¶ 15.

On December 13, 2012, Retrophin awarded Su and Huang, respectively, 126,388 and 78,644 shares of restricted Retrophin stock ("the shares") in order to "make up for a portion of the salary and benefits that it failed to properly provide [them]." *Id.* ¶¶ 16–18.  The physical stock certificates for the shares were stamped with a restrictive legend indicating that they were not registered under the Securities Act of 1933 (the "Act") and could not be sold without being registered under the Act or qualifying for a recognized exemption to such registration.  *Id.* ¶ 19.

In late 2012, both Su and Huang left Retrophin.  *Id.* ¶ 24.  Both then commenced individual legal actions against Retrophin and its affiliates, seeking unpaid salary and benefits. *Id.* ¶ 25.  On March 25, 2013, Huang filed an action in the New York State Supreme Court.  *See* Gordon Decl. (Doc. 19), Ex. 3.[3]  On May 20, 2013, Su, whose Employment Agreement with Retrophin contained an arbitration provision, commenced an arbitration proceeding before the

According to the docket on ECF, Doc. 10 formally represents the assertion of Su's and Huang's third-party claims, while Doc. 11 formally represents the assertion of their crossclaims.

[3] All references to the "Gordon Decl." pertain to the Declaration of Michael S. Gordon in Support of (1) Retrophin's and Standard's Motion to Dismiss Su's and Huang's Crossclaims, and (2) Katten Muchin's Motion to Dismiss Su's and Huang's Third-Party Claims (Doc. 19).  Exhibit 3 is a copy of the summons and complaint from Huang's state court action.  The Court may take judicial notice of the existence of Su's and Huang's respective suits and the public documents filed therein.  *See, e.g.*, *Henneberger v. Cty. of Nassau*, 465 F. Supp. 2d 176, 185 (E.D.N.Y. 2006) (taking judicial notice of arbitration decision because a "court may take judicial notice of an opinion issued in a prior proceeding") (citing *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006)). Furthermore, the Court notes that Crossclaim Plaintiffs expressly refer to their respective suits in their pleadings. Crosscl. ¶ 25.

American Arbitration Association.  *See id.*, Exs. 2, 4.[4]   Both legal actions were ongoing during the events of December 2013 that are most critical to the instant motion.

Both Su and Huang maintained individual brokerage and checking accounts with Schwab.  Crosscl. ¶ 8.  In March 2013, Su asked Schwab to determine whether he could offer his Retrophin shares for public sale.  *Id.* ¶ 28.  Schwab contacted Retrophin's legal counsel, Katten Muchin, which informed Schwab that, under United States Securities and Exchange Commission ("SEC") Rule 144, 17 C.F.R. § 230.144 ("Rule 144"), Su's shares could *not* yet be publicly sold.  *Id.* ¶ 31.  Rule 144 permits public resale of restricted stock shares only where a holder has held those shares for a minimum period of six months.  Crosscl. ¶ 21.  Where an issuing company was at some point in its existence defined as a "shell company" under SEC regulations, however, a holder may not sell its restricted stock for a period of one year from the date on which the issuing company files notice with the SEC indicating that it is no longer a shell company.  *Id.* ¶ 22.  In June 2013, Su learned that he would need to hold his restricted Retrophin shares for one year, rather than the usual six-month waiting period under Rule 144, due to the fact that Retrophin had been classified as a shell company.  *Id.* ¶ 32.

In December 2013, having held their restricted shares for the required one-year period, Su and Huang informed Schwab that they wished to sell their shares.  *Id.* ¶¶ 34–35.  Both men "correctly and truthfully informed Schwab" that they were not aware of any "restrictions on their individual ability to offer their shares of Retrophin stock for sale," apart from the now-lapsed Rule 144 restrictions.  *Id.* ¶ 36.  On December 13, 2013, Schwab contacted Retrophin's transfer agent, Standard, which confirmed (i) that Su's shares were eligible for public sale, subject only

---

[4] Exhibits 2 and 4, respectively, are Su's demand for arbitration against Retrophin and Su's Employment Agreement with Retrophin.

to standard seller's and broker's representation letters, and (ii) that Michelle Griswold, Esq. ("Griswold") at Katten Muchin was Retrophin's authorized contact attorney. *Id.* ¶¶ 39–40.  That same day, Schwab contacted Griswold, who confirmed that Su's shares were eligible for sale, subject only to standard representation letters and not to a formal legal opinion from Katten Muchin. *Id.* ¶¶ 41–42.  On December 26, 2013, Schwab contacted Griswold to confirm that Huang's shares were eligible for public sale under the same conditions. *Id.* ¶¶ 43–44.  On December 30, 2013, Schwab contacted Standard, which confirmed the same. *Id.* ¶¶ 45–46.

Between December 17, 2013 and December 23, 2013, Schwab sold all of Su's 126,388 shares at an average price of approximately $7.10 per share, netting $896,819.16 in total proceeds. *Id.* ¶¶ 48–49.  On December 26, 2013, Su's shares were sent to Standard for clearance and transmission to Schwab's custodian, the Depository Trust Company ("DTC"), which "credited Schwab's position in Retrophin," and the proceeds from Su's sales were then transmitted into his Schwab brokerage account. *Id.* ¶¶ 50–51.  Schwab informed Su that the proceeds from the sales were in his account on December 27, 2013. *Id.* ¶ 52.  On December 30, 2013, however, Standard informed Schwab that despite Standard's prior representation that Su's shares were eligible for sale, the shares were in fact subject to an order from Retrophin (the "Stop-Transfer Order") that prohibited the sale or transfer of Su's shares absent Retrophin's express written approval. *Id.* ¶ 53.[5]

---

[5] A "stop transfer order" is notification to the issuer of a security of an adverse interest or claim against that security, and generally requires the issuer to notify the party that placed the order should there be an attempt to sell or transfer the security.  Like here, it is frequently triggered when the status of a security is put in dispute via litigation. *See, e.g.*, *Transcon. Oil Corp. v. Trenton Prods. Co.*, 560 F.2d 94, 105 (2d Cir. 1977) ("One of the instances in which the corporation has the right, and even the duty, to refuse to register a transfer is when adverse claims to the stock are asserted.  Indeed, the issuer may be held liable to the adverse claimant if it allows the transfer of a security when it has either actual notice of or sufficient information to put it on inquiry as to the adverse claim.") (citations omitted); *Miller v. Katz*, No. CIV. A. 94-4317, 1996 WL 187561, at *2 (E.D. Pa. Apr. 17, 1996) ("Miller again, in the fall of 1994, tried to convert his shares, but the stock was subject to a 'stop transfer' order, because, by this time, Miller had instituted this action for breach of contract, which placed the stock and warrants at issue.").

The same sequence occurred with respect to Huang's shares shortly thereafter.  On December 30, 2013, Schwab sold 60,649 of Huang's Retrophin shares at an average price of $6.83 per share, netting $414,093.74 in total proceeds.  *Id.* ¶ 56.  On January 6, 2014, Huang's shares were sent to Standard for clearance and transmission to DTC, and the proceeds from Huang's sales were transmitted into his Schwab brokerage account that same day.  *Id.* ¶ 57.  On January 10, 2014, however, Standard notified Schwab that it was issuing "an after-the-fact notice rejecting Schwab's sales transaction of Huang['s] shares," which were subject to the same Stop-Transfer Order as Su's shares.  *Id.* ¶ 58.

The actual timing of the Stop-Transfer Order, placed on both Su's and Huang's shares, remains unclear.  Defendants, in their moving papers, maintain that the Stop-Transfer Order was placed in response to Su's arbitration and Huang's state-court suit, but they do not specify a particular date.  *See* Mem. Supp. Crosscl. Defs.' & Third-Party Def.'s Mot. Dismiss ("Defs.' Br.") (Doc. 20) 6.  Su and Huang, on the other hand, allege a number of alternative theories.

First, Su and Huang allege that the Stop-Transfer Order as to Su's shares *had not* been put in place prior to December 13, 2013, the day Schwab was told that Su's shares were freely transferable, but that nonetheless Retrophin falsely informed Standard that the Stop-Transfer Order on Su's shares *had been* put in place prior to that date.  *Id.* ¶¶ 67–68.  Likewise, they allege that Retrophin, again falsely, informed Standard that the Stop-Transfer Order on Huang's shares *had been* put in place prior to December 26, 2013, the day Standard and Katten Muchin told Schwab that Huang's shares were freely transferable.  *Id.* ¶¶ 69–70.

Second, and in the alternative, Su and Huang allege that Retrophin did in fact place a Stop-Transfer Order on Su's and Huang's shares prior to December 13, 2013 (for Su) and

December 26, 2013 (for Huang), but that Retrophin failed to inform Standard of the existence of the Stop-Transfer Order until December 30, 2013, at earliest. *Id.* ¶¶ 71–72.

Third, again in the alternative, Su and Huang allege that Retrophin placed the Stop-Transfer Order prior to their requests to sell, that Retrophin did in fact inform Standard in a timely fashion, but that Standard subsequently failed to inform Schwab of the existence of the Stop-Transfer Order on December 13, 2013 and December 26, 2013. *Id.* ¶¶ 73–74.

Unfortunately, none of the subsequent briefing on the instant motion has clarified the precise timing of the Stop-Transfer Order or the reasons that Schwab was not told of its existence until after the sales had been consummated.

In any event, by the time Schwab learned of the Stop-Transfer Order, it had already executed Su's and Huang's sales, fulfilling purchase orders with unrestricted Retrophin stock that it held in its own inventory and disbursing the proceeds to Su's and Huang's accounts. *Id.* ¶¶ 52, 57. Schwab informed Standard that unless it delivered unrestricted Retrophin shares to Schwab on behalf of Su and Huang, Schwab would be forced to fulfill its obligations to the counterparties to Su's and Huang's sales by purchasing additional shares on the open market. *Id.* ¶¶ 55, 60. But Standard and Retrophin refused to provide Schwab with unrestricted shares, and on January 17, 2014, Schwab commenced purchasing Retrophin shares on the open market. *Id.* ¶¶ 61–62. By that point, Retrophin's share price had increased "dramatically" from its December 2013 price. *Id.* ¶ 63. To meet its obligations for the Su sales, Schwab purchased 126,388 Retrophin shares at an average price of $11.90 per share, resulting in an expenditure by Schwab of $1,504,027.42. *Id.* ¶ 64. To meet its obligations for the Huang sales, Schwab purchased 60,649 shares at an average price of $12.44 per share, resulting in an expenditure by Schwab of $754,876.97. *Id.* ¶ 65. In addition, although this allegation is inexplicably absent

from their complaint, Su and Huang's opposition brief asserts that Schwab subsequently "seized the proceeds from its earlier sale of the Shares from Su's and Huang's brokerage accounts." Mem. Opp'n Crosscl. Defs.' & Third-Party Def's. Mots. Dismiss ("Pls.' Opp'n") (Doc. 24) 4.

### B.  Procedural History

Schwab filed its initial complaint against Retrophin, Standard, Su, and Huang on June 13, 2014.  Schwab Compl. (Doc. 1).  In its complaint, Schwab brought claims for:  indemnification against Su and Huang; fraudulent inducement against Su; negligent misrepresentation against Standard; and agent, respondeat superior, and vicarious liability against Retrophin.  *Id.* ¶¶ 88– 130.  On July 18, 2014, Su and Huang filed their answers, crossclaims, and third-party claims.  *See* Answer, Cross Claims and Third Party Complaint (Docs. 10, 11).  In their crossclaims, Su and Huang assert causes of action for fraud against Retrophin (First and Second Causes of Action); fraudulent misrepresentation against Retrophin (Third and Fourth Causes of Action); negligence against Retrophin (Fifth and Sixth Causes of Action); negligence against Standard (Seventh and Eighth Causes of Action); conversion against Retrophin (Ninth and Tenth Causes of Action); and for declaratory judgment against Retrophin and Standard (Eleventh and Twelfth Causes of Action).  Crosscl. ¶¶ 75–128.  In their third-party complaint, Su and Huang assert causes of action for negligence against Katten Muchin (First and Second Causes of Action). Answer, Cross Claims and Third Party Complaint ("Third-Party Compl.") (Doc. 10) ¶¶ 71–78.

On September 5, 2014, Retrophin and Standard filed a motion to dismiss Schwab's Complaint (Doc. 15), and Retrophin, Standard, and Katten Muchin filed a motion to dismiss Su and Huang's crossclaims and third-party claims (Doc. 18).  While these motions were pending, on August 7, 2015, Schwab dismissed all of its claims in this action.  *See* Stipulation of Voluntary Dismissal (Doc. 37).  Schwab's stipulation of voluntary dismissal, however, has no

bearing on the crossclaims asserted by Su and Huang against Retrophin and Standard or the third-party claims asserted by Su and Huang against Katten Muchin. *Id.* Before the Court are Retrophin, Standard, and Katten Muchin's motion to dismiss those claims. (Doc. 18).

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Motions to Dismiss: General Legal Standard

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570; *see also Iqbal*, 556 U.S. at 680.

The question in a Rule 12(b)(6) motion to dismiss "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 278 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil

Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's

statement of a claim for relief without resolving a contest regarding its substantive merits,'" and

without regard for the weight of the evidence that might be offered in support of the plaintiff's

claims.  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Glob. Network Commc'ns,*

*Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

> On a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider:
>
> (1) facts alleged in the complaint and documents attached to it or incorporated in it
> by reference, (2) documents "integral" to the complaint and relied upon in it, even
> if not attached or incorporated by reference, (3) documents or information
> contained in [a] defendant's motion papers if plaintiff has knowledge or possession
> of the material and relied on it in framing the complaint, (4) public disclosure
> documents required by law to be, and that have been, filed with the Securities and
> Exchange Commission, and (5) facts of which judicial notice may properly be taken
> under Rule 201 of the Federal Rules of Evidence.

*Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011) (citations omitted);

*see also Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d Cir. 2000).   With respect to judicial notice

of facts, the Court "may take judicial notice of a document filed in another court 'not for the

truth of the matters asserted in the other litigation, but rather to establish the fact of such

litigation and related filings.'"  *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A.,*

*Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Liberty Mutual Ins. Co. v. Rotches Pork Packers,*

*Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)).

### B.  Heightened Pleading Standard under Rule 9(b)

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the

heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the

circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint*

*Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citation

omitted); *Pasternack v. Lab. Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2011 WL 3478732, at *5

(S.D.N.Y. Aug. 1, 2011) ("Claims of common law fraud must satisfy the requirements of Rule 9(b).") (citing *Healthcare Fin. Group, Inc. v. Bank Leumi USA*, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009)).  Specifically, Rule 9(b) requires that a fraud claim based on misstatements must identify:  (1) the allegedly fraudulent statements, (2) the speaker, (3) where and when the statements were made, and (4) why the statements were fraudulent.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012) (citing *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  "[C]onclusory allegations that defendant's conduct was fraudulent or deceptive are not enough."  *Decker v. Massey–Ferguson Ltd.*, 681 F.2d 111, 114 (2d Cir. 1982) (citation omitted).  Conditions of a person's mind—such as malice, intent or knowledge—may be alleged generally, however.  *See* Fed. R. Civ. P. 9(b).

## III. DISCUSSION

In their motion to dismiss, the Defendants argue as follows:  (1) Su's claims are barred by a recent arbitration award that found a binding settlement agreement between Su and Retrophin; (2) Su's and Huang's first through fourth fraud-based crossclaims against Retrophin must be dismissed, because of their failure to plead fraudulent intent, to plead fraudulent misrepresentation with sufficient particularity, and to plead detrimental reliance; (3) Su's and Huang's fifth through eighth crossclaims for negligence must be dismissed, because Retrophin and Standard did not owe them any duty of care; (4) Su's and Huang's ninth and tenth crossclaims for conversion against Retrophin must be dismissed, because they lacked a possessory interest shares already assigned to Schwab; (5) Su's and Huang's eleventh and twelfth crossclaims for declaratory relief against Retrophin and Standard must be dismissed as duplicative and unripe; and (6) Su's and Huang's third-party claims for negligence against Katten Muchin must be dismissed, because Katten Muchin did not owe them any duty of care.

11

### A.  Su's Claims Are Barred by *Res Judicata*

Defendants seek to dismiss all of Su's claims based on the existence of an arbitration award that found a binding settlement agreement between Su and Retrophin, dated August 7, 2013, in which Su agreed to settle his outstanding claims and sell his shares back to Retrophin for a cash settlement.  *See* Defs.' Br. 12–14.[6]  Defendants contend that the doctrine of *res judicata* bars Su's claims against Retrophin because the arbitration panel conclusively settled all claims that Su had or could have asserted against Retrophin regarding his employment and compensation (including the shares at issue here).  *Id.*[7]  They also maintain that *res judicata* bars Su's claims against Standard and Katten Muchin due to their privity with Retrophin.  *Id*. at 14.

Su makes no mention of the outcome of the arbitration in his pleadings, despite the announcement of the arbitrator's final award a month *prior* to Su's filing of his crossclaims and third-party claim here.  *Compare* Gordon Decl., Ex. 7 (final arbitration award dated June 9, 2014), *with* Crosscl. (filed July 18, 2014).  Rather, Su maintains that the Court may not consider the arbitration award without converting the present motion to dismiss into a motion for summary judgment.  Pls.' Opp'n 16–17.

Su's argument is misplaced and, if accepted, it would prohibit the Court from ever determining the preclusive effect of an arbitration award on a motion to dismiss, so long as the plaintiff purposely ignores mention of the arbitration in his or her pleadings.  That is plainly not the law.  *See, e.g.*, *Gorbaty v. Kelly*, No. 01 Civ. 8112 (LMM), 2003 WL 21673627, at *2 & n.3

---

[6] The Defendants also argue that Su's employment agreement with Retrophin requires the arbitration of the claims brought here.  Defs.' Br. 13.  Defendants, however, have not moved to compel arbitration, seeking only dismissal with prejudice.

[7] Defendants also assert that their initial moving brief constitutes notice, pursuant to Fed. R. Civ. P. 11(c)(2), that they may seek leave to move for sanctions against Su under Fed. R. Civ. P. 11, based on Su's filing his crossclaims and third-party claims in contravention of the arbitration award.  *See* Defs.' Br. 14.

(S.D.N.Y. July 17, 2003) (taking judicial notice of an arbitration award to determine, on a motion to dismiss, whether *res judicata* applied to the action at bar).

To dismiss a claim under the doctrine of *res judicata*, "a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). "It is well settled that this doctrine serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings." *Pike v. Freeman*, 266 F.3d 78, 90 (2d Cir. 2001).

On the merits of the *res judicata* defense, the only prong that Su takes issue with is the final one, arguing that his current action involves "claims that never were and never could have been brought" in the arbitration proceeding. Pls.' Opp'n 17. "Whether a claim that was not raised in the previous action could have been raised therein 'depends in part on whether the same transaction or connected series of transactions is at issue, and whether the same evidence is needed to support both claims.'" *Pike*, 266 F.3d at 91 (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir. 1997)). "To ascertain whether two actions spring from the same 'transaction' or 'claim,' [the court] looks to whether the underlying facts are 'related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Id.* (quoting *Interoceanica Corp.*, 107 F.3d at 90). "The question is not whether the applicable procedural rules *permitted* assertion of the claim in the first proceeding; rather, the question is whether the claim was sufficiently related to the claims that were asserted in the first proceeding that it *should have been* asserted in that proceeding." *Id*. (citation omitted).

13

Su's claims here are sufficiently related to the dispute settled in the arbitration proceeding and should have been brought therein.  The Retrophin shares at issue in this litigation were allegedly awarded to Su in "an effort to make up for a portion of the salary and benefits that [Retrophin] failed to properly provide," and Su brought the arbitration proceeding "in order to seek payment for back salary and other unpaid benefit amounts."  Crosscl. ¶¶ 16, 25.  All of the allegedly unlawful conduct in this litigation took place in December 2013, a month *before* Su and Retrophin agreed, at a January 28, 2014 management conference, that the initial threshold issue for arbitration would be whether the parties had already entered into a binding settlement in which Su agreed to sell his shares back to Retrophin.  *See* Gordon Decl., Ex. 6 at I.A.  It is unfathomable that Su neglected to arbitrate the legitimacy of the Stop-Transfer Order placed on the very shares being fought over, and even if he was so careless, claims related to that Order surely could have and should have been included in the arbitration proceeding.

The Court thus concludes that all the requirements of preclusion by *res judicata* are satisfied, and dismisses all of Su's claims with prejudice.[8]  Even without *res judicata*, however, the Court notes that all of the discussion below as to whether Huang's allegations adequately state a claim for relief applies equally to Su's allegations.  As such, the Court will continue to discuss the claims at issue collectively as those brought by both Su and Huang.

### B. Fraud-Based Claims (First Through Fourth Causes of Action; Against Retrophin)

Crossclaim Plaintiffs' first four causes of action allege fraud and fraudulent misrepresentation by Retrophin.  To prevail, they "must prove a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of

---

[8] Su fails to make any argument in rebuttal to the Defendants' contention that his claims against Standard and Katten Munchin are barred by *res judicata* by virtue of their privity with Retrophin.  *See* Defs.' Br. 14 (citing cases).  Su's claims against Standard and Katten Munchin are thus also barred by *res judicata*.

inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1373 (N.Y. 1996) (citations omitted).

### 1.  *Fraud*

To state a claim for common law fraud under New York law, a plaintiff must allege the following:  "(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant[ ] intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss[.]" *Stephenson v. PricewaterhouseCoopers, LLP*, 482 F. App'x 618, 622 (2d Cir. 2012), *as amended* (June 13, 2012) (summary order) (citing *Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195–96 (N.Y. 2007)).  "Claims of common law fraud must satisfy the requirements of Rule 9(b)." *Pasternack*, 2011 WL 3478732, at *5.

Most relevant to Crossclaim Defendants' motion to dismiss, Su and Huang must adequately plead scienter.  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011) ("A common law fraud claim in New York requires the plaintiff to plead scienter.") (citing *Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).  To meet the scienter requirement, Su and Huang must allege facts that give rise to a strong inference of fraudulent intent.  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 469 (S.D.N.Y. 2004) (collecting cases to support the proposition that the Second Circuit has long-interpreted Rule 9(b) to require securities-fraud plaintiffs to plead "facts giving rise to a strong inference of

fraudulent intent").[9]  They may do so by alleging facts that either (1) show that the defendant had

both the "motive and opportunity" to commit the alleged fraud, or (2) "constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*,

459 F.3d 273, 290–91 (2d Cir. 2006) (citation omitted); *see also, e.g.*, *Ho v. Guoyuan Glob.

Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012).  Where a plaintiff fails to allege motive

to commit fraud, the alleged circumstantial evidence of recklessness "must be correspondingly

greater."  *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation and internal quotation

marks omitted).  In this context, recklessness means "conscious recklessness—*i.e.*, a state of

mind *approximating actual intent*, and *not merely a heightened form of negligence*."  *S. Cherry

St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216

F.3d 300, 312 (2d Cir. 2000)).

     In their First and Second Causes of Action, the Crossclaim Plaintiffs allege fraud by

Retrophin.  Specifically, Su and Huang allege that Retrophin failed to inform them that the Stop-

Transfer Order was placed on their shares in order "to make [Su and Huang] believe that [they]

could sell [their] Retrophin stock after complying with the holding requirements of Rule 144."

Crosscl. ¶¶ 76–77, 82–83.

     These allegations fail to support a plausible inference of motive, let alone a strong

inference.  It is implausible that Retrophin would purposely hold off on notifying Su and Huang

of the Stop-Transfer Order until after they sold their shares, thereby defeating the entire purpose

of the Stop-Transfer Order.  *See* Retrophin's Rep. Mem. Supp. Crosscl. Defs.' Mot. Dismiss

("Retrophin Rep.") (Doc. 30) 4.  Su and Huang offer no explanation for what "concrete benefits"

---

[9] The scienter element for common law fraud "is essentially the same as that under federal securities laws."  *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010) (citation omitted), *aff'd*, 485 F. App'x 461 (2d Cir. 2012).

Retrophin would have gained by inducing the sales, alleging only an ill-defined motive to retaliate against them.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.").  Indeed, Retrophin's allegedly intentional conduct is precisely what triggered Schwab's lawsuit *against Retrophin*.  Where "'plaintiff's view of the facts defies economic reason,…[it] does not yield a reasonable inference of fraudulent intent.'"  *Kalnit*, 264 F.3d at 140–41 (quoting *Shields*, 25 F.3d at 1130).  That is the case here.

Nor do the allegations demonstrate conscious misbehavior or recklessness on the part of Retrophin supporting a strong inference of fraudulent intent.[10]  Since Su and Huang have "failed to demonstrate that defendants had a motive to defraud…, [they] must produce a stronger inference of recklessness."  *Kalnit*, 264 F.3d at 143 (citation omitted).  No such stronger inference can be found here, where Su and Huang's theory that Retrophin induced them into erroneously selling their shares is belied by Retrophin and Katten's year-long effort to enforce the Rule 144 restrictions blocking such sales.  Crosscl. ¶¶ 31–32.  The Court cannot find a strong inference that Retrophin recklessly baited Su and Huang into selling their shares when Retrophin's financial interests and all of its alleged conduct, save the one allegedly fraudulent omission, was consistent with the restriction of such sales.  This conclusion is even more compelling in the face of Su and Huang's sole *ipse dixit* argument in opposition, which consists entirely of begging the critical question.  *See* Pls.' Opp'n 19 ("The [] only two possible reasons Retrophin failed to disclose…are that Retrophin was negligent or Retrophin knew of the

---

[10] Su and Huang come nowhere close to alleging a plausible inference of *conscious* misbehavior.  *Cf. In re Philip*, 383 F. Supp. 2d at 471 ("Conscious misbehavior 'is easily identified since it encompasses deliberate illegal behavior.'") (quoting *Novak*, 216 F.3d at 308).

existence of the Stop Transfer [O]rder and intentionally chose to not report to

Schwab….*Assuming that Retrophin knew that the Stop Transfer [O]rder on the Shares existed*

*and chose not to tell Schwab, Su or Huang,…what other possible explanations exist other than a*

*fraudulent intent on the part of Retrophin to cause damage to Su and Huang?*") (emphasis

added).

    Consequently, Su's and Huang's fraud claims against Retrophin do not adequately plead

scienter, and they are dismissed.

### 2. *Fraudulent Misrepresentation*

    Under New York law, the essential elements of fraudulent misrepresentation are:

"(1) representation of a material existing fact, (2) falsity, (3) scienter, (4) deception, and

(5) injury." *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 543 (S.D.N.Y. 2007)

(citation omitted).  Thus, to prevail on such a claim, a plaintiff must show that:  "'(1) the

defendant made a material false representation, (2) the defendant intended to defraud the plaintiff

thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered

damage as a result of such reliance.'"  *Id.* at 543–44 (quoting *Manning v. Utils. Mut. Ins. Co.,*

*Inc.*, 254 F.3d 387, 400 (2d Cir. 2001)).  In addition, like all allegations of fraud, claims of

fraudulent misrepresentation must state the circumstances constituting fraud with particularity, in

accordance with Rule 9(b).  *Id.* at 544.

    In their Third and Fourth Causes of Action, Su and Huang proceed on the alternative

theory that Retrophin fraudulently misrepresented to Schwab and Standard that the Stop-Transfer

Order had been imposed *before* Schwab's sale of Su's and Huang's shares.  Crosscl. ¶¶ 88–89,

94–95.  Su and Huang allege that Retrophin made this false representation recklessly and in

order to deceive Schwab and Standard, aware that Standard's reliance would cause damage to Su

and Huang.  *Id.* ¶¶ 90, 96.  Finally, Su and Huang allege that Standard in fact relied on the
representation and that Su and Huang were injured as a result.  *Id.* ¶¶ 91–92, 97–98.

    The Crossclaim Defendants argue that Su's and Huang's fraudulent misrepresentation
claims fail because they do not plead that *Su and Huang themselves* detrimentally relied upon
Retrophin's purported misrepresentations.  *See* Defs.' Br. 18.  Su and Huang do not contest this
characterization of their allegations.  *See* Pls.' Opp'n 20 ("The crossclaims clearly allege that
Retrophin made a false representation to Schwab and Standard *knowing that Standard and
Schwab would rely* on the same and that in so doing, Su and Huang would be damaged.")
(emphasis added).  Nor could they, as the allegations clearly state that the purported
misrepresentations took place on or about December 30, 2013 and January 10, 2014, *i.e. after* Su
and Huang had already consummated their transactions with Schwab.  Crosscl. ¶¶ 67–71.  There
is, in other words, no allegation that Su and Huang took *any* action in direct reliance on
Retrophin's alleged misrepresentations.

    As such, the fraudulent misrepresentation claims must be dismissed.  The Second Circuit
has held that "a plaintiff does not establish the reliance element of fraud for purposes of…New
York law by showing only that a third party relied on a defendant's false statements."  *Cement &
Concrete Workers Dist. Council Welfare Fund, Pension Fund, Legal Servs. Fund & Annuity
Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998); *see also City of New York v. Smokes–
Spirits.com, Inc.*, 541 F.3d 425, 454 (2d Cir. 2008) ("[A]llegations of third-party reliance…are
insufficient to make out a common law fraud claim under New York law."), *rev'd on other
grounds and remanded sub nom. Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010).
Although this point of law has long been in contention, a recent decision from the Southern
District set forth a thorough analysis that reconciled the competing lines of cases and concluded,

convincingly in this Court's opinion, that New York law does not recognize a fraudulent misrepresentation claim premised on third-party reliance.  *See Pasternack v. Lab. Corp. of Am.*, No. 10 Civ. 4426 (PGG), 2014 WL 4832299, at *15–18 (S.D.N.Y. Sept. 29, 2014).  Like all of the district courts that have tackled this question in the wake of *Pasternack*,[11] this Court adopts its reasoning.  Thus, Su's and Huang's fraudulent misrepresentations claims are dismissed because they fail to allege that Su and Huang relied on the purported misrepresentations.

### C.  Negligence Claims (Fifth Through Eighth Causes of Action; Against Retrophin and Standard)

In their Fifth and Sixth Crossclaims, Plaintiffs allege that they were injured by Retrophin's negligent failure to inform Standard about the existence of the Stop-Transfer Order.  Crosscl. ¶¶ 99–106.  In their Seventh and Eighth Crossclaims, they allege injury as a result of Standard's negligent failure to inform Schwab about the Stop-Transfer Order.  *Id.* ¶¶ 107–114.

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'"  *Anschutz Corp.*, 690 F.3d at 114 (quoting *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000)).

As a preliminary matter, the Crossclaim Complaint fails completely to allege that Retrophin or Standard owed Su or Huang any duty of care directly.  See Crosscl. ¶¶ 100, 104

---

[11] *See In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 (NRB), 2015 WL 4634541, at *58 (S.D.N.Y. Aug. 4, 2015); *Mid Atl. Framing, LLC v. Varish Constr., Inc.*, No. 3:13-CV-01376 (MAD), 2015 WL 4508590, at *6–7 (N.D.N.Y. July 24, 2015); *Sarafianos v. Shandong Tada Auto-Parking Co.*, No. 13-cv-3895 (SAS), 2014 WL 7238339, at *6 & n.59 (S.D.N.Y. Dec. 19, 2014); *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 267–70 (E.D.N.Y. 2014), *aff'd*, No. 14-4780, 2015 WL 5559865 (2d Cir. Sept. 22, 2015).

(alleging only that Retrophin "deviat[ed] from the accepted standard of care *for a corporation dealing with its transfer agent*") (emphasis added); *id.* ¶¶ 108, 112 (alleging only that Standard "deviat[ed] from the accepted standard of care *for a transfer agent dealing with a broker-dealer*") (emphasis added).  Despite this omission, Su and Huang maintain that their allegations adequately plead facts establishing that they had a "special" or "privity-like" relationship with Retrophin and Standard.  *See* Pls.' Opp'n 21.  But even if the Court accepts this gloss on the crossclaim allegations, Su's and Huang's negligence claims must still be dismissed for failure to plead the duty element adequately.

"Under the 'duty' element, 'New York strictly limits negligent misrepresentation claims to situations involving actual privity of contract between the parties or a relationship so close as to approach that of privity.'"  *Anschutz Corp.*, 690 F.3d at 114 (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993)).  To establish such a privity-like relationship under New York law, a plaintiff must plead:  "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance."  *Prudential Ins. Co. of Am. v. Dewey, Ballantine, Bushby, Palmer & Wood*, 605 N.E.2d 318, 321–22 (N.Y. 1992) (citing *Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985)); *see also JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 401 (S.D.N.Y. 2004).

Here, Su and Huang fail to adequately plead the required privity-like relationship with Retrophin or Standard.  Their allegations plainly demonstrate that neither had *any* direct contact with either Retrophin or Standard.  Absent such direct contact or an equivalent substantive communication, there is no plausible inference of a relationship approaching privity.  *See Secs.*

21

*Inv'r Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 75 (2d Cir.) ("To demonstrate linking conduct, a plaintiff generally must show some form of direct contact between the [professional] and the plaintiff, such as a face-to-face conversation, the sharing of documents, or other 'substantive communication' between the parties.") (citations omitted), *certifying question to* 734 N.E.2d 1211 (2000), *certified question answered* 746 N.E.2d 1042 (2001).  Su and Huang do not argue that there was any direct communication, nor do they even attempt to explain why a privity-like relationship arose between them and Retrophin or Standard, despite the lack of such contact.  Furthermore, Su and Huang do not articulate how they could possibly be in privity with Retrophin in December 2013, when both men were actively litigating against the company at the time, Su in arbitration and Huang in state court.

In addition to their failure to plead a privity-like relationship, Su and Huang also do not adequately plead their intent to rely, or their actual, reasonable reliance, upon Retrophin's or Standard's representations.  Although Su and Huang, for the first time in opposition, now maintain that they "relied on the information both they and Schwab received from Standard," Pls.' Opp'n 21, such an assertion is conclusory, lacks explanation, and contradicts their actual allegations.  According to Su and Huang's complaint, their direction to Schwab to sell their shares, coupled with assurances that they were not aware of any legal restrictions on those shares, took place *before* Standard made any representation to Schwab as to the status of the shares.  *See* Crosscl. ¶¶ 35–36, 39.  The allegations thus do not demonstrate any reliance on the part of Su and Huang because they did not engage in any conduct subsequent to, and in reliance upon, the representations from Standard to Schwab, nor did they partake in any due diligence of their own into the status of their shares, despite ongoing litigation concerning their compensation, of which the shares were a part.

In fact, the one case that Su and Huang cite in support of their negligence claims, *Prudential Ins. Co.*, demonstrates precisely the allegations that they fail to plead here. 605 N.E.2d 318.  In *Prudential*, the defendant law-firm furnished a formal opinion letter directly to the plaintiff, for the express "end and aim" of advising the plaintiff, who then acted in reliance upon the letter.  *Id.* at 322.  No such direct contact or detrimental reliance is pleaded here.  Su and Huang's negligence claims against Retrophin and Standard are thus dismissed.

### D.  Conversion Claims (Ninth and Tenth Causes of Action; Against Retrophin)

Su and Huang next allege that Retrophin, by instructing Standard not to provide Schwab with unrestricted shared of Retrophin stock, "assumed unauthorized rights" over Su's and Huang's property "for the purpose of depriving [them] of [their] rightful use of the same." Crosscl. ¶¶ 116, 120.

"Conversion is the 'unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another party.'"  *Onanuga v. Pfizer, Inc.*, No. 03 Civ. 5405 (CM), 2003 WL 22670842, at *4 (S.D.N.Y. Nov. 7, 2003) (quoting *Messe v. Miller*, 436 N.Y.S.2d 496, 500 (N.Y. App. Div. 1981)).  "Under New York law, [t]he elements of conversion are (1) plaintiff's legal ownership or an immediate superior right of possession to specific, identifiable personal property and (2) defendant's exercise of unauthorized dominion over the thing in question to the exclusion of plaintiff's rights."  *Briarpatch Ltd., L.P. v. Pate*, 81 F. Supp. 2d 509, 516–17 (S.D.N.Y. 2000) (citation and internal quotation marks omitted).

To assert a colorable conversion claim under New York law, a plaintiff must allege that he had legal title to, or a possessory interest in, the property alleged to have been converted.  *See, e.g.*, *Thea v. Thea*, 726 N.Y.S.2d 655, 656 (N.Y. App. Div. 2001).  Crossclaim Defendants argue

23

that Su and Huang do not adequately plead a possessory interest in the shares, because Standard's instructions to Schwab regarding the Stop-Transfer Order came *after* Su and Huang had "sold, assigned and transferred their Shares to Schwab," exchanging their certificates for proceeds that had already been deposited in their Schwab accounts by the time of Standard's delivery of the Stop-Transfer Order. Defs.' Br. 22 (citing "Irrevocable Stock or Bond Power" documents signed by Su and Huang, Schwab Compl. (Doc. 1), Exs. M, Q). In response, Su and Huang do not dispute this timeline or argue that the alleged conversion took place prior to the transfer of their shares to Schwab. Rather, as their only response and without citation to any legal authorities, Su and Huang assert that they provided their shares to Schwab only "for a limited purpose," and "when such purpose was thwarted by the efforts of Retrophin, Su and Huang continued to maintain their possessory interest in the Shares." Pls.' Opp'n 22.

Su and Huang's impromptu argument cannot save their conversion claims. This purported "limited" assignment is not alleged anywhere in their complaint, arising for the first time in the opposition papers. Even still, Su and Huang's proposition is tenuous and the lack of supporting legal authorities telling, because case law makes clear that contingent, contractual rights do not suffice to establish a present possessory interest for the purposes of a conversion claim. *Cf., e.g.*, *Onanuga*, 2003 WL 22670842, at *4 (holding that holder of stock option, prior to its exercise, "lacks a sufficient possessory interest in the stock to maintain [a conversion] action"); *Orchid Constr. Corp. v. Gonzalez*, 932 N.Y.S.2d 125, 127 (N.Y. App. Div. 2011) (holding that plaintiff-contractor with contractual right to payment "never had ownership, possession, or control of" the funds allegedly converted).

Furthermore, Su and Huang do not contest the Crossclaim Defendants' reliance on the "Irrevocable Stock or Bond Power" documents in which Su and Huang "s[old], assign[ed], and

transfer[red]" their shares, Schwab Compl. (Doc 1), Exs. M, Q,[12] and nowhere on the face of

those documents is there any indication of such a "limited" assignment.  To the contrary, Su and

Huang's own allegations make clear that Schwab concluded the sale of Su's shares on December

23, 2013 and delivered the proceeds from the sale into Su's Schwab account by December 27,

2013.  Crosscl. ¶¶ 48, 52.  Standard communicated to Schwab that Su's shares were subject to a

Stop-Transfer Order three days later, on December 30, 2013.  *Id.* ¶ 53.  The same goes for

Huang, who received the proceeds from the sale of his shares on or about January 6, 2014, four

days before Standard delivered to Schwab notice regarding the Stop-Transfer Order.  *See id.* ¶¶

56–58.  Thus, neither Su nor Huang had a possessory interest in the shares at the time of the

alleged conversion, when Standard notified Schwab of the Stop-Transfer Order, and as a result

their conversion claims must be dismissed.  *See Di Siena v. Di Siena*, 698 N.Y.S.2d 93, 95 (N.Y.

App. Div. 1999) ("Here, plaintiff relinquished his ownership rights to his shares prior to the time

of the alleged conversion and, therefore, he cannot maintain a conversion action.") (citation

omitted).[13]

---

[12] And, as Crossclaim Defendants correctly note, Retrophin Rep. 7 n.4, such documents are "integral" to Su and Huang's allegations because they summarize the force and effect of the documents in their allegations.  Crossl. ¶¶ 35–36.  Coupled with Su and Huang's failure to contest Crossclaim Defendants' reliance on these documents, the Court may properly consider them at the motion-to-dismiss stage.

[13] In addition, the Court notes that Su and Huang do not adequately plead that the Stop-Transfer Order was in any way "unauthorized," because nowhere do they plausibly allege that Retrophin lacked the authority to install such an order upon the commencement of litigation over the shares in question.  *See Wisetex Trading Ltd. v. Gindi*, No. 00 Civ. 2671 (JSM), 2001 WL 8591, at *1 (S.D.N.Y. Jan. 3, 2001) (listing the elements of conversion under New York law, including whether "the defendant's possession of the property was unauthorized"), *aff'd*, 24 F. App'x 101 (2d Cir. 2002).  This is yet another reason why Su and Huang fail to state a claim for relief with respect their conversion claims.  *See, e.g.*, *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 330 (S.D.N.Y. 2011) (finding failure to plead defendant's exercise of "an unauthorized dominion" because no alleged facts demonstrated defendant's actions were "unlawful or wrongful"); *Citadel Mgmt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 151 (S.D.N.Y. 2000) (analyzing whether complaint "properly pleads the 'unauthorized dominion' element" of conversion).

### E.  Declaratory Relief Claims (Eleventh and Twelfth Causes of Action; Against Retrophin and Standard)

Su's and Huang's final crossclaims are for declaratory relief against Retrophin and Standard.  Specifically, they seek a declaration that the Crossclaim Defendants are "responsible" for the damages "claimed and/or suffered by Schwab," and that Su and Huang "ha[ve] no liability for the same."   Crosscl. ¶¶ 124–25, 127–28.   While Crossclaim Defendants argue that these claims are duplicative of Su's and Huang's other causes of action, Defs.' Br. 22–23, Su and Huang in opposition make no effort to clarify the purpose of their requests for declaratory relief, asserting only that they "should be permitted to seek all available remedies under each applicable theory of recovery," Pls.' Opp'n 23.

"Under New York law, '[a] declaratory judgment should not be rendered unless it will serve some useful purpose to the parties.'"  *Koch v. Rodenstock*, No. 06 Civ. 6586 (BSJ) (DF), 2012 WL 5844187, at *12 (S.D.N.Y. May 9, 2012) (quoting *Walsh v. Andorn*, 311 N.E.2d 476, 478 (N.Y. 1974)), *report and recommendation adopted*, 2012 WL 5845455 (S.D.N.Y. Nov. 19, 2012).  A declaratory judgment should "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations," and courts should exercise their discretion to award such relief "judicially and with care."  *Id.* (citations omitted).

Su and Huang seek declarations with respect to Schwab's claims for liability and damages, but Schwab has voluntarily dismissed its claims and no longer maintains any action for damages.  *See* Stipulation of Voluntary Dismissal (Doc. 37).  The declarations that Su and Huang seek are thus unnecessary.  Furthermore, where "a full and adequate remedy is already provided by another well-known form of action," declaratory relief is also unnecessary.  *Id.* (citing *Walsh*, 311 N.E.2d at 478; *Apple Records, Inc. v. Capitol Records, Inc.*, 529 N.Y.S.2d 279, 281 (N.Y.

App. Div. 1988)).  That is the case here, where Su and Huang essentially seek a declaration stating that the allegations proffered in support of their substantive claims are true.  *See id.* ("Plaintiff essentially seeks a judicial declaration that the principal factual allegations supporting his fraud claim are true.  The requested declaratory relief should be denied, as Plaintiff misconstrues the purpose of a declaratory judgment action and improperly seeks declaratory relief based on allegations that are entirely duplicative of his fraud claim.").  Thus, the claims for declaratory judgment are dismissed.

### F.  Third-Party Claims for Negligence (Against Katten Muchin)

Finally, Su and Huang bring third-party claims against Katten Muchin for negligence.  Third-Party Compl. ¶¶ 71–78.  Specifically, they allege that Katten Muchin negligently failed to inform Schwab of the existence of the Stop-Transfer Order, which foreseeably caused damage to Su and Huang.  *Id.*  These claims fail for the same reason that the negligence claims against Retrophin and Standard fail:  Su and Huang do not adequately plead the existence of a privity-like relationship with Katten Muchin.

Like their negligence claims against Retrophin and Standard, Su and Huang again fail to allege that Katten Muchin owed them any duty directly.  *See id.* ¶¶ 72, 76 (alleging only "a deviation from the accepted standard of care *for an attorney dealing with a broker-dealer*") (emphasis added).  More critically, however, the allegations fail to establish any privity-like relationship with Katten Muchin, with whom neither Su nor Huang had any contact whatsoever.  *See, e.g.*, *Sanders v. Bressler, Amery & Ross, P.C.*, No. 03 CV 5283 (DRH), 2006 WL 319303, at *6 (E.D.N.Y. Feb. 10, 2006) ("Unlike the present action, in cases where the court imposed liability despite a lack of actual privity, some form of linking conduct was clearly present, such as a lawyer preparing an opinion letter at the direction of his client which is addressed to the

third party or which expressly invites the third party's reliance.") (citing *Prudential Ins. Co.*, 605 N.E.2d at 322; *Doehla v. Wathne Ltd., Inc.*, No. 98 Civ. 6087 (CSH), 1999 WL 566311, at *20 (S.D.N.Y. Aug. 3, 1999)); *see also Eaves*, 785 F. Supp. 2d at 255 (noting that courts find near-privity between attorneys and non-clients "only under the rarest of circumstances," usually "only when the attorney, at the client's request, issues an 'opinion letter' which the attorney knew would be relied on by a third party.") (citing *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466, 480 (S.D.N.Y. 2001)).[14]

Indeed, in their most telling omission, Su and Huang nowhere contend that Katten Muchin knew that they intended to rely on Katten Muchin's representations.  "To show 'near privity,' a plaintiff must allege…that *the attorney demonstrated an understanding* of the plaintiff's reliance."  *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, No. 12 CIV. 9459 (PAE), 2013 WL 3357921, at *6 n.6 (S.D.N.Y. July 2, 2013) (emphasis added) (citations omitted), *aff'd*, 552 F. App'x 79 (2d Cir. 2014).  Here, Su and Huang's opposition papers state only that "Katten was fully aware that its statements made relevant to the shares *would be relied on by Schwab*."  Pls.' Opp'n 23 (emphasis added).  This alone demonstrates the lack of a privity-like relationship.  *See Cusack v. Greenberg Traurig, LLP*, 972 N.Y.S.2d 11, 13 (N.Y. App. Div. 2013) ("Nor is there near privity to support a claim of legal malpractice based on an allegedly negligent misrepresentation….[T]he opinion letter was addressed to BNY Mellon, and as plaintiff alleged in the complaint, the parties contemplated only that BNY Mellon, not plaintiff, would rely on the letter.") (citation omitted).  Su's and Huang's negligence claims against Katten Muchin are thus dismissed.

---

[14] The Court again notes that utter lack of case law or any other legal authority in Su and Huang's opposition papers in support of their negligence claims against Katten Muchin.  *See* Pls.' Opp'n 23–24.

### G.  Leave to Replead

In response to their opponents' request for dismissal with prejudice, Su and Huang seek leave to replead any of their claims that are dismissed.  *See generally* Pls.' Opp'n.  Since the Court has already dismissed Su's claims with prejudice based on the doctrine of *res judicata*, the only question remaining is whether to grant Huang leave to replead.

Rule 15 of the Federal Rules of Civil Procedure instructs courts to "freely give leave" to replead "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The United States Supreme Court has stated that it would be an abuse of discretion, "inconsistent with the spirit of the Federal Rules," for a district court to deny leave without some justification, "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Second Circuit has stated that a court should allow leave to amend a pleading unless the non-moving party can establish "prejudice or bad faith."  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  Motions to seek leave to amend are ultimately within the discretion of the district courts, *Foman*, 371 U.S. at 182, but they should be handled with a "strong preference for resolving disputes on the merits," *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (quoting *New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005)).  Indeed, upon granting a motion to dismiss, the "usual practice" in this Circuit is to permit amendment of the complaint.  *See, e.g.*, *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990); *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, No. 07 Civ. 10453 (RWS), 2011 WL 4357166, at *2–3 (S.D.N.Y. Sept. 13, 2011) (noting a "strong preference" in favor of

granting leave to amend and collecting cases).  Nevertheless, amendment "is not warranted absent some indication as to what [plaintiffs] might add to their complaint in order to make it viable." *Shemian v. Research In Motion Ltd.*, 570 F. App'x 32, 37 (2d Cir. 2014) (summary order) (citations omitted).

Defendants do not make any attempt to establish prejudice, nor do they argue that Huang has demonstrated any bad faith in his pleadings.  There is, however, no indication as to what Huang may add to his fraud claim that would make it viable, given the nonsensical nature of his theory of fraudulent intent.  *See supra* III.B.I.  The same is true for the duplicative and unnecessary claim for declaratory relief.  Thus, the Court grants Huang leave to replead his claims for fraudulent misrepresentation, negligence, and conversion.

## IV. CONCLUSION

For the reasons set forth above, the Crossclaim Defendants and Third-Party Defendant's motion to dismiss is GRANTED.  Huang's motion to amend shall be due by **October 20, 2015.** The Clerk of the Court is respectfully directed to terminate the motions, Docs. 15 and 18.

It is SO ORDERED.

Dated:   September 30, 2015
         New York, New York

Edgardo Ramos, U.S.D.J.